Your willingness to accept the CJA appointment. Thank you. May it please the court. Judge Benton, Judge Render, Judge Shepard. This case is for this court out of the Southern District of Iowa where Mr. Myron Brandon was convicted in that district of kidnapping and transporting a minor across state lines for sexual purposes. The alleged crimes in this case occurred in 2003 and the admission of 404B evidence played very heavily into that as part of Mr. Brandon's contention here and part of his objections an issue that he's raised to the court. The evidence that was presented for the 404B was that Mr. Brandon in 2004 of kidnapping another minor girl that time at 9 point and was prosecuted and convicted in state court. The main 404B evidence also was that Mr. Brandon had attempted to kidnap another minor at 9 point in 2003 as well because of this 404B evidence and its admission into evidence by the court in this case. It was imperative for Mr. Brandon to test by every degree allowable by law the evidence that was purported in this case of the actual offense for which he was charged and that was to prevent obviously a conviction based on improper propensity evidence. The evidence that was presented here that actually concerned the underlying charge or the charge at issue in front of the district court had to do with two minor victims, 14 and 15 years old, Ms. Smith and Ms. Seeping, that alleged initially that they were picked up by someone for a ride and transported across state lines into Iowa. As the story came about, they were picked up on the side of the street. Tell us what the jury believed. What the jury believed? Yeah. What do you think the jury believed? I believe that the jury found that Mr. Brandon kidnapped the girls either without their consent, that he seized them without their consent, or that he enveigled them by a prosecution or a promise of prosecution and transported them across state lines into Iowa. Those are potential theories that were put forward. I think that this gets to my concern, Judge, with the consent instruction for kidnapping and the instruction that was requested by the defense to let the jurors know that it's not simply enough for someone to transport another person across state lines and then at that point then to either seize or to enveigle them, but rather the intent has to be there prior to the transportation occurring. And we briefed that in the third issue that we have here, Judge, or excuse me, the second issue that we have regarding consent. So with the jury potentially believing either theory and being able to reach a conviction based off of both of those, the enveiglement was the clear theory that was put forward in this case, and so therefore there's not an issue with consent or at what point consent may have been withdrawn. But that's not what was charged, Judge, and that's not what was instructed upon. What was instructed upon was multiple theories of, for seizure enveiglement, which I think are the two main here at issue. There was evidence, some evidence of seizure as well that was brought in. One of the complainants, Ms. Smith, originally, so they get found on the side of the highway, early morning hours one day, they seek medical attention. The morning later that day they get a report to police. Ms. Smith at the time stated to medical personnel that she's first interviewed that she was actually seized and thrown into a vehicle by two males. One blonde with blue eyes, the other brown with brown eyes. So there was evidence of seizure in place. So the jury credited that even despite apparently Ms. Smith recanting that later on, then that could be evidence of a formal basis of a seizure offense. And again, which would require an additional instruction or clarification on the instructions to the jurors that a seizure has to have occurred and the lack of consent has to have occurred prior to transportation in interstate commerce in order to fulfill the third and fourth elements here, Judge. It's the the discrepancies between the two witnesses were very significant. Both discrepancies that they had at the time of the report, the day after they were picked up off the side of the road, as well as discrepancies they had at trial. What was clear, what the evidence did establish. Mr. Black, can we go back to your consent argument? Am I wrong? I thought that the kidnapping charge, the elements of kidnapping did include an element of without consent. They do judge only in the first element. So we have asked, we've asked the court to include an element of lack of consent in the transportation offense to make it clear that the transportation took place after the withdrawal of consent occurred. But if they convicted on the kidnapping, wouldn't that have required without consent prior to the transportation? It would have if they were properly instructed, Judge. The instruction as it was given did not notify the jury that the transportation had to take place, rather just simply that a seizure occurred without consent in element one. In element three, concerning the transportation in interstate commerce, that focused on, or that was not, there was no reference to consent there at all. That's what we were requesting of the court. What about the little word while in the three paragraph of the instruction? Because notice it says the transported her while and then uses the same words as in element one. Does the while refer back to the paragraph that has ONE on it? It certainly could be read that way, Judge. I don't think that it is nearly as clear as it needs to be. When consent or withdrawal of consent is very clearly stated in element one, and there's no definition or nothing provided to the jurors whenever they're being instructed as to consent in that element, the transportation element, I do believe that that is inappropriate or certainly not a clear statement of what the law would require. So as the states, but the cases we've cited before, particularly the Hernandez-Orozco case, discusses the transportation of a minor that occurred, where the minor actually alleged that the seizure occurred prior to leaving state or being transported in interstate commerce. However, evidence that was presented throughout the trial, including from the testimony of the minor, is that she had actually danced with and seemed to enjoy her time with her supposed captors. So the question became, the question that was decided in that case was, or that we gave the rule of principle of law that was decided in that case, is that consent has to be withdrawn or has to be, the seizure has to be a violation of a person without their consent prior to transportation in interstate commerce. What became clear during their 2003 interview with police officers, so the trial occurred October 2021, this is dating back to a 2003 time where the officers interviewed Ms. Seavey and Ms. Smith the day after this is alleged to have occurred. While initially Ms. Smith stating that she was simply seized, and she and Ms. Seavey were seized, thrown in the car, and then driven off. Ms. Seavey's version originally was that they had asked, Ms. Smith had asked someone for a ride home. And that Ms. Seavey had gotten in the car with Ms. Smith and then drove away. What became clear though, during the context of the police interview, is that there was some exchange of money that was involved, and an agreement for an exchange of money that was involved. Where the Ms. Seavey, or Ms. Smith particularly, said that Ms. Seavey got her money from this kind of transaction, that she got her money from having sex with men. The defense sought to introduce that portion of Ms. Smith's testimony, or Ms. Smith's statement to police under Rule of Evidence 412. And the defense argued that this was constitutionally required to be able to make the argument to the jury that there may have been someone else who was the cause of these injuries. When looking at who that person may be, it's important to know that the only thing that established a connection between Mr. Brandon and either Ms. Smith or Ms. Seavey was a DNA sample found in Ms. Smith's vagina. The testimony from Dana Warren, who was the DNA expert called by the government, was that DNA evidence can actually survive for up to five days in a vaginal tract. So there's a five-day period from when the test was taken, the morning after the kidnapping, the morning after they were found on the side of the road. The time frame at which Mr. Brandon's DNA could have gotten in Ms. Smith's vagina was five days prior. So with that then, there being no other connection, a question that Mr. Brandon wanted to raise to the jury, and a question that the defense sought to elicit, information that the defense sought to elicit, was that Ms. Seavey was engaged in prostitution prior to this. This would go to establish potentially that Ms. Seavey had a pimp, somebody who was responsible for her safety and her financial well-being. There was evidence provided by a police officer, Omaha police officer, Sheena Ray, who testified at the trial. She established that during this time frame, that prostitution was very prominent, particularly in the area that Ms. Seavey and Ms. Smith alleged they were picked up in. She also talked about how many of the prostitutes at the time had pimps, people who they called their boyfriend. And this is somebody who they, Ms., or Detective Ray testified at the time, this is someone who quite often girls feared and tried to protect. What we see from the transcript of the police interview with Ms. Seavey is that she was accompanied, or potentially could have been accompanied, by someone who officers asked, they asked, who's your boyfriend? And she said, my boyfriend's a primo. This was right at the end of the interview, apparently apropos of nothing. But when tied with Detective Ray's statement at trial, the evidence that she put in, that prostitutes often refer to their pimps as boyfriends, this is one possibility that Mr. Brandon wanted to argue. Evidence also came in through Ms. Boatwright, who was a sex assault trauma examiner. And Ms. Boatwright, she talked about trauma and the effects that it could have on someone in Ms. Smith or Ms. Seavey's situation. She said that frequently, or not infrequently I guess, children will lie about what happened in a particular incident in order to protect those who are important to them. Again, looking at Detective Ray's statement, that pimps were people who the prostitutes at the time feared, especially the younger prostitutes feared and wanted to protect. If these injuries had been inflicted on Ms. Smith and Ms. Seavey by someone who was connected to Ms. Seavey in that capacity, or even Ms. Smith as well in that capacity, Mr. Brandon sought to argue that. That was denied by the court. The court found that this was not constitutionally required. I think that this, a constitutional argument from a Sixth Amendment perspective is probably best elucidated actually by the 28-J notice or letter that I gave to the court regarding United States v. Pumpkin. Judge Shepard, I believe you were on that panel at the 8th Circuit at the end of last calendar year, where there was analysis and discussion about the limits of what is required in cross-examination of a witness. In that case, the two main witnesses had a history of drug abuse. The defendant sought to elicit information about their history of drug abuse and was denied by the court. Mr. Black, if the suggestion I think you're trying to make is that the pimp was the assaulter, couldn't that have just been explored during cross-examination of the two victims? I attempted to judge and was denied the same. As well as in closing argument, I had requested, or I intended to make the argument, and the government specifically raised the motion and let it be granted by the court, prohibiting me from being able to argue that in closing argument. Let me get this right. You were prohibited from asking if Mr. X, who was allegedly the pimp, was the assaulter and not the defendant? I was prohibited from asking about her past history of prostitution, Judge. Well, okay, but those are not necessarily two different things, right? I mean, couldn't you have, if you know the identity of Mr. Pimp, so to speak, couldn't you have just asked, wasn't he the assaulter? I was prohibited, Judge, specifically from the court in going into information about, even using the word pimp, because it implies a past sexual history. Sure, but couldn't you have asked, wasn't Mr. X the assaulter? I could have asked that, Judge. However, there would have been no context for the jury to understand the motive that someone would have to lie at the time. That was the reason. Doesn't that depend on the answer, Counsel? You're experienced, I can tell. That might depend on the answer. If you say, did Mr. X do it? That's true, Judge. I did ask on cross-examination whether Pringle was her boyfriend at the time, and she responded that he was not her boyfriend at the time. Again, in contradiction to what she told police. I see that I'm going into my response time now. If the court would like to address anything this time, I can. Otherwise, I'll reserve my rebuttal time. Very well. Thank you, Mr. Black. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Counsel. My name is Shelly Sudman, and I represent the United States for the Southern District of Iowa. And I'm here to discuss to you the case against Mr. Brandon, United States, versus Mr. Myron Brandon. This case did involve a cold case from 2003 in which DNA was located in one of the vaginal swabs of one of the victims, Ms. Smith. And that DNA was then analyzed, and a CODIS hit identified Mr. Brandon as a possible donor. Then officers obtained a DNA swab pursuant to a federal search warrant, and that sample was analyzed by the DCI Laboratory in the state of Iowa, and the DNA was a match for Mr. Brandon based out of 1.9 million. So based on that information, the law enforcement then continued that investigation with Mr. Brandon as the suspect. They reviewed the old transcripts from the interview and the hospital medical reports and found some information that the girls had admitted in 2003 regarding what the person looked like, where the person picked the girls up, what kind of car the person was driving, because at the time Ms. Smith and Stevie did not know their perpetrator when they reported this to the police, and so there was no evidence for law enforcement to go on in 2003. So the investigation then went and confirmed that Mr. Brandon had a prior prostitution just one month later in the same area of Omaha, Nebraska, where the girls were picked up. He had a black Ford pickup truck in 2003, which the girls identified as a black pickup truck. His physique and his identifying features were similar to the information that the girls provided, and also he lived in an area of Pacific Junction, Iowa, which is Mills County, Iowa, that runs parallel with Interstate 29. Now, in, um, as part of the investigation then, they've tracked down, law enforcement tracked down the Good Samaritan witnesses that stopped along the highway and picked these two girls up after they were able to escape from Mr. Brandon, and one of the, and these two people were 18 years old, so they were 18 and they picked up a 14 and 15 year old girl between 2 and 5 in the morning on the interstate. And Miss Woodard, who was familiar with that area and grew up in that area, was able to identify the location on the interstate where they were picked up, which ironically was close to Mr. Brandon's residence. So, based on all of those, um, those factors, Mr. Brandon was charged. As part of this case, um, Mr. Brandon attempted to elicit information pursuant to, as an exception to Rule 412, as to prior prostitution. The government would submit to this court that the district court did follow prior precedent in overruling the defendant's request to admit this prior prostitution evidence primarily, as consistent with um, other cases, um, and Mr. Brandon relied on C, violation of his constitutional rights. But what it's important to know is that in those court rulings that have favored Mr. Brandon like Zephyr is they've relied on specific incidences of previous sexual contact. But Mr. Brandon did not have any specific acts. He wanted a general blanket of prior prostitution of Ms. Stevie, which the only evidence that was anywhere in any of the discovery or offered into evidence at all was that Ms. Smith had reported to Investigator Ritchie that he, um, that she said that he, excuse me, that Ms. Stevie had prior engagements in prostitution that she had told her. Um, and that was a question directly posed by Investigator Ritchie. So this information um, the government would pose is how is it relevant to whether or not these two girls got into the car with Mr. Brandon on that date. Prior acts of sexual abuse is not relevant to, um, it doesn't prove or disprove um, a person's actions on a particular day and that is exactly what the spirit of Rule 412 is, is not to bring in prior or subsequent allegations of sexual activity. Not only that, it's hearsay because it's a statement by another person. And it also, Ms. Stevie's um, prior prostitution does, how does that prove the fact that Ms. Smith had DNA um, of Mr. Brandon in her vaginal tract because the argument was that Mr. Brandon argued is that Ms. Stevie, Mr. Brandon could have had sexual activity with Ms. Smith prior to June 21st of 2003 but Ms. Smith, there was no evidence that Ms. Smith had ever engaged in prior prostitution. On that note, both Ms. Stevie and Ms. Smith denied that they knew Mr. Brandon or had ever seen him before and there was no information offered or asked of them whether or not Ms. Smith had a prior, um, knew Mr. Brandon for any prior reasons. As to the PIM theory, um, the government would submit that the district court property overruled the admission of that evidence. It was just a defense theory based on assumptions, based on a couple statements made in court. Somehow, the fact that Ms. Stevie reported she had a boyfriend, then was equated to a PIM based on Ms. Well, there's evidence in the record that boyfriend can mean PIM, right? There is very little evidence, in fact... I think, Counselor, you're saying there was evidence that boyfriend can mean PIM, right? Not necessarily. Well, what was the question, what was the answer? If you're going to quibble, let's quibble. Go ahead. First of all, when Ms. Ray was asked, um, she said, rarely, she said, rarely do prostitutes have PIMs at that time. So that's why I was hesitant to say yes or no. And then, Investigator Ritchie, who actually asked the question, when he was posed the same question, he said, no, I wouldn't characterize it like that. A long-term investigator with the Sheriff's Department. So for those reasons, the government would submit there wasn't enough evidence. And, also, what's important... What's the basis, and I thought it was in the briefs too, for what the other Counsel said very clearly, which is there's evidence in the record that the term boyfriend can mean PIM. What is... Tell us the evidence. That statement that Shayna made, that rare... She said, rarely do prostitutes have PIMs at the time, but they sometimes refer to them as their boyfriend. Thank you. Also, but there was no further evidence as that, and furthermore, the District Court judge did allow Mr. Brandon to discuss injuries on that day. He could have said Pringo, he could have said someone else, and he did argue it could have been by someone else. The District Court only didn't allow the word PIM because it connotates a relationship with someone in a prostitution PIM relationship. So that would expand the sexual history of Ms. Smith and Ms. Seavey. There was also no evidence that there was any sort of ritualistic burnings or brandings. That was... The girls were burned on their breasts, but there was no evidence offered that there was any... that it was ritualistic or it was a brand. It was just they both were burned. She said, rarely, just for the Court's knowledge, at Trial Transcript 2 at between 113 and 115. And the Court, the District Court, did allow Mr. Brandon to discuss this information at trial as it pertained to the facts on that day as to whether or not they were picked up for prostitution and whether or not anyone injured them at Trial Transcript 396 through 99. As Mr. Brandon today also discussed the 404B evidence that was offered as part of this trial. And the government would submit that the District Court correctly allowed this information into evidence based on intent, plan, identity, lack of accident or mistake. It had a bearing on the facts of this case. It was not introduced for propensity, especially when, as Mr. Brandon relied on the fact that I didn't do it, but if I did, it was consensual. And so for those reasons, especially identity, would be important, especially when the prior 404B evidence had to deal with minors in the exact same location or area where Smith and Seavey were arrested. It's a very rural area. So these girls are picked up in a downtown Omaha metropolitan area and taken to a very remote area that one of the officers testified is you can only access this area by a field entrance or a gravel road. And so they're taken to this remote area and then there are two instances, one in 2003 and one in 2004, both within a year of this initial incident where Mr. Brandon had taken a minor by knife point. Not only that, he threatened to kill one of them if they didn't keep quiet, which is also consistent with what Ms. Seavey and Ms. Smith reported having to go having to happen to them. And so these instances became important when you're looking at his identity because it goes to all of those things. In addition to that, when they searched Mr. Brandon's car in 2004, they found a knife in his car. They found female undergarments. They also, the girls reported initially to law enforcement that he took their undergarments and put them in a bag in his car. And then, so all of those facts are consistent with the information that from the other 404B acts in 2003 and 2004. Also, if you look at this evidence, these girls, after they were assaulted, when they had the opportunity, so when we talked about consent, I'm going to go back to the consent argument, the government can make an argument on all of those theories, and so they all were included, but we have to remember that they're 14 and 15 years old, and so they're picked up with a promise that they're getting a ride home. That was mentioned, or to a friend's house, in their first transcript in 2003. And also, it's also important to note, when they testified, they said I didn't want to go to Iowa, I didn't consent to going to Iowa when I was picked up, I didn't consent to having sex with this person, I didn't consent to being burned, I didn't consent to being bound. So, that alone is enough to convict their statements at the trial is enough to convict them of the crime of kidnapping. Now, the jury was fully aware of all their inconsistent statements from their ages. All of that but for the little bit there was a little bit of redaction that talked about their prior sexual experience like prostitution, whether or not they were virgins, and the fact that they had a sexually transmitted disease, all by which Rule 412 clearly up to this point has excluded that type of evidence for good reason. It's the spirit of Rule 412. So, they admitted and this court was correct that jury instruction that as far as jury instruction number 12 is in element 3 it clearly says while she was seized, confined, and beguiled, decoyed, kidnapped, abducted, carried away, or kept. So, if they believe element 1 it says while. So, the district court ruled that this was redundant, that it was already explained when sufficiently and it is the model jury instruction. The district court has broad discretion and it's the government's submission to this court that the district court properly instructed the jury on the law, the issues, and the elements of the crime. And as far as the consent goes, it's also important to note that not only did they admit to that, but if you look up the facts and this would also apply to the motion for new trial, is that both Ms. Seedy and Ms. Smith escaped at the first opportunity. They reported throughout every time that they were questioned that he took out a gas can and started pouring gas around the vehicle in this highly remote area where there was no houses. They could see an interstate in the distance. The medical report said they had scratches on them, they were caked in mud, they had bruises on them. And so, they were fleeing for their lives at the time when they got the opportunity to escape and that's after being transported, sexually assaulted, bound, burned, threatened with a knife which they have scratches on them. One of Ms. Smith had scratches on her arm that would be consistent based on the medical personnel and Investigator Ritchie, superficial scratches. And so, they take a ride from somebody and all of these things happen. And when they escape, they have to choose what to do next and they took another ride from two strangers. So, that really shows how afraid they were in the government's opinion and the facts of the case also support that because Ms. Woodard testified that these girls were fleeing for their lives. That's how she described and characterized them at the time. And so, based on all of the evidence that was submitted, the government would submit to the court, if no one has any additional questions for me, that the district court's rulings on all the issues should be upheld and Mr. Brannon's appeal should be dismissed. Thank you. Thank you, Ms. Sudman. Mr. Black, your rebuttal. Thank you, Your Honor. Just to clarify, Ms. Detective Ray, Shayna Ray, did say that in her words, that the prostitutes in the Omaha area at the time of the offense sometimes had pimps and then in a separate place, she said, rarely. So, just to clarify that for the court, with regard to Element 3 of the kidnapping offense, I want to draw the court's attention to the interstate commerce element being only present in Element 4. So, Judge Benton, when you were previously asking about being transported while someone was seized or unveiled, transportation doesn't necessarily have to be while in interstate commerce. It could be parsed out. In other words, the jury could parse that out. So, my requested instruction to the court was to notify the jury, to be sure the jury understood that the law required the transportation to take place after consent had, or after someone had been seized without their consent. So, transportation did take place under these circumstances that the witnesses have testified that after they got to Iowa, they went to a couple of different places and were moved a couple of different times. So, transportation could have taken place, potentially, in this case, after a consensual agreement was made, an arrangement was made, interstate commerce occurred, or transportation in interstate commerce occurred, and once they got to Iowa, other transportation occurred. The seizure takes place, and they're transported one more time. So, potentially, that's the problem of this instruction, without having clarification to the jury that consent is required to be withdrawn prior to transportation in interstate commerce, and that's the basis of my objection here. With regard to, I would just like to briefly touch on the 28J letter that was filed by the government in this case, since I did not previously. I would agree that that case, the Morera case, would solve the issue that we raised here in issue number three as the Eighth Circuit precedent, defining the Eighth Circuit precedent. I would take the  all due respect to Judge Grunder and Judge Venn, I would take the position of Judge that the statute is in its terms a transportation statute. Of course, you'll have to get the interest of an en banc court for that. But what a well-written opinion. Incredible. And I see my time is up. Does the court have anything additional? Thank you, Mr. Black and Ms. Sudman. We appreciate your briefing and arguments today. The case is submitted, and we'll issue an opinion in due course.